UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 16-cr-23 |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ANIS CHALHOUB, M.D., | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the United States's request to investigate whether to disqualify Defense counsel, Kent Wicker, from representing Dr. Chalhoub in the current case. Though a formal motion has not been filed, this Court is able to assess a request for disqualification without a formal motion. *See Moss v. United States*, 323 F.3d 445, 471 (6th Cir. 2003) ("[A] trial court has the duty to inquire adequately into a trial counsel's conflict of interest if it knows or reasonably should know that a particular conflict exists.") Both parties have presented simultaneous briefing and oral argument took place on May 26, 2017. For the following reasons, this Court finds that Mr. Wicker is disqualified from representing Dr. Chalhoub.

# I

The current case "stems from a broader health care fraud investigation of unnecessary cardiac procedures at Saint Joseph Hospital in London."[1] [R. 29 at 1.] Saint Joseph Health System "is a wholly-owned subsidiary of the national nonprofit health organization Catholic Health Initiatives [] and operated" Saint Joseph Hospital in London, KY. [*Id*.] Kent Wicker represented Catholic Health Initiatives prior to 2012[2] "regarding their hospitals in Kentucky, including functioning as a liaison to local federal prosecutors on certain self-disclosure issues." [R. 30 at 2.]

In 2011, Mr. Wicker began assisting on a matter related to "overutilization of stent procedures by Dr. Samesh Patil at the St. Joseph's Hospital in London, Kentucky, owned by CHI." [R. 30 at 2.] Mr. Wicker attended "interviews of several employees" by Government investigators. [R. 30 at 2; R. 30-1 at 2.] Dr. Chalhoub was not at issue in this case, though his name came up in some of the interviews as another cardiologist in the hospital. [R. 30 at 2; R. 30-1 at 2.] After interviewing some of the employees, another attorney, Daniel S. Reinberg of the Chicago office of Polsinelli PC, took over the case. [R. 30 at 2.] Mr. Wicker asserts that his only involvement after this point was to be copied on occasional letters or emails. Mr. Wicker asserts that Mr. Reinburg's office billed during that time for copying and bates stamping documents produced to the government in response to a civil investigation demand. [R. 30-1 at 2.]

---

[1] Though somewhat unclear, the parties seem to refer to Saint Joseph Health System (SJHS), Saint Joseph Hospital in London, KY (SJL), and Catholic Health Initiatives (CHI) interchangeably. Where it is possible to discern separate roles, this Court has endeavored to use the name used by the parties in each situation.
[2] Mr. Wicker and the Government disagree on his representation. Mr. Wicker asserts that he represented Catholic Health Initiatives, but the Government asserts that Mr. Wicker represented Saint Joseph Health Systems. [*See* R. 29 at 1; R. 30 at 2.]

On March 10, 2011, three doctors from Saint Joseph Hospital in London, KY, filed a qui tam complaint under the False Claims Act "alleging that several doctors affiliated with SJL, including Chalhoub, performed a variety of unnecessary cardiac procedures, such as stents and pacemakers." [*See* R. 29 at 3; *See U.S. ex rel. Jones v. Saint Joseph Health System, Inc*, 6:11-cv-00081-GFVT.] Though Mr. Wicker does not recall it, he admits he would have read the complaint when he received the unsealed complaint in the summer or fall of 2012." [R. 30-1 at 2.] Chalhoub was not a named Defendant in the False Claims Act, but the "complaint did allege that he had installed unnecessary pacemakers." [R. 29-3 at 32-34.] For example, the qui tam complaint makes the following allegation:

> Anis Chalhoub, M.D. . . . implanted a permanent pacemaker in Patient C at Defendant St. Joseph London. Based on Relators' treatment of Patient C and their review of the medical records and imaging, the patient had no symptomatic or documented arrhythmias to clinically justify the placement of a pacemaker. It was not reasonable or necessary for the treatment of the patient, and it subjected the patient to an unreasonably increased risk of morbidity and mortality.

[R. 29-3 at 33.] In fact, the Government points out that "one or more" of the same exact procedures named in the qui tam complaint is at issue in the current case against Dr. Chalhoub. [R. 29 at 10.]

In response to the qui tam complaint, on September 29, 2011, the Government sent a Civil Investigative Demand to SJHS. [*Id.* at 4.] They demanded SJHS "produce medical records . . . for 41 pacemaker procedures, many of which Chalhoub performed, so that the government could conduct a review of the records to determine if those pacemaker procedures were medically necessary and reimbursable." [R. 29 at 5; R. 29-3 at 2; R. 29-3 at 3; R. 29-3 at 28.] The Civil Investigation Demand was served on Kent Wicker, as counsel for St. Joseph Health System. [R. 29-3 at 2.]

As part of its response to the Civil Investigation Demand, SJHS "provided a privilege log . . . which contained a number of entries that related to Chalhoub." [R. 29 at 5.] Mr. Wicker was copied on this email. [*Id*. at 5.] After an internal investigation following the qui tam complaint, SJHS terminated Dr. Chalhoub's employment on June 24, 2013. [*Id*.] On January 22, 2014, the United States settled with SJHS and "[t]he "Covered Conduct" released in the settlement agreement included, among other allegations, the same alleged conduct by Dr. Chalhoub that now forms the basis for the indictment in this case." [*Id*.] SJHS also agreed to cooperate in the Government's investigation. [*Id*.]

The Government presented an affidavit from Daniel Reinburg of Polsinelli PC, who presented additional facts regarding Mr. Wicker's representation. [*See* R. 29-1.] Mr. Reinburg alleges that "[w]hile the government's initial investigation appeared to focus on the procedures performed by Dr. Patil, it became clear to [him] as SJHS counsel that within a short period of time . . . the government had initiated parallel civil and criminal investigations of issues broader than just the procedures performed by Dr. Patil." [*Id*. at 3.] He based this conclusion on contacts with the Eastern District of Kentucky United States Attorney's Office and the "information they began requesting from SJHS." [*Id*. at 3.] Mr. Reinburg alleges that, "by September 2011, it was clear to [him] as counsel for SJHS that the government's investigation related (or at least in part) to Dr. Anis Chalhoub . . . and certain pacemaker . . . procedures he performed" at Saint Joseph London. [R. 20-1 at 4.] Daniel Reinberg also reported that "SJHS provided its initial response to the CID on October 28, 2011, its supplemental response on May 18, 2012, and its second supplemental response to the CID on April 5, 2013." [R. 29-1 at 4.] Mr. Reinberg asserts that Mr. Wicker was listed as counsel for SJHS on all these responses and "[s]ome of the documents and information provided in the CID Responses related to Dr. Chalhoub and pacemaker

4

procedures he performed . . . [and] . . . payment information from SJHS to Dr. Chalhoub and contracts between SJHS and Dr. Chalhoub." [*Id*.] Mr. Reinberg claims that he "continued to interact with Mr. Wicker up to, and through, the period of the settlement," and that his communications with Mr. Wicker related to the "underlying facts . . . , but also the formulation of legal strategy with respect to the investigation." [*Id*.] In contrast, Mr. Wicker claims he was not involved in the defense or settlement of this case and "learned about the settlement by reading the newspaper." [R. 30-1 at 2.] Finally, Mr. Reinberg states that "SJHS has not, and will not, waive the conflict of interest created by Mr. Wicker's representation of Dr. Chalhoub." [R. 29-1 at 8.]

Mr. Wicker was approached in mid-April 2017 to represent Dr. Chalhoub. [R. 30 at 4.] He considered whether his representation of CHI would impact his ability to represent Dr. Chalhoub and appropriately reached out to the Kentucky Bar Association Ethics Hotline in a timely manner. [*Id*.] Mr. Wicker spoke with Frank Mellen, a partner at Wyatt, Tarrant & Combs and a volunteer for the Kentucky Bar Association Ethics Hotline Committee, about his representation and Mr. Mellen "concluded that there was no conflict precluding Mr. Wicker's representation." [*Id*. at 5.] This Court acknowledges the careful thoughtfulness of Mr. Wicker in seeking an ethics opinion before accepting representation.

Dr. Chalhoub has submitted an affidavit asserting that he wants Kent Wicker to be the "lead counsel" in his case. [R. 30-2 at 1.] He acknowledges that Mr. Wicker represented CHI, but does not believe that Mr. Wicker's prior representation "impairs his representation of [Dr. Chalhoub], or gives [him] an unfair advantage." [*Id*.]

Oral Argument was conducted on May 26, 2017, on this limited issue. This Court requested Mr. Wicker return to the Kentucky Bar Association and seek another opinion with the

additional information the Government provided concerning Mr. Wicker's representation of CHI and SJHS. [R. 37 at 47.] Mr. Wicker promptly submitted the additional information to the Kentucky Bar Association. On May 31, 2017, Mr. Wicker notified the Court that the Kentucky Bar Association declined to provide another opinion.[3] [*See* R. 33.]

## II

"The Sixth Amendment right to assistance of counsel is a fundamental right so essential to a fair trial that it is part of the Due Process Clause of the Fourteenth Amendment and thus applicable to the states." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Gideon v. Wainwright,* 372 U.S. 335, 344 (1963)). However, the Sixth Amendment does not provide a right to a *specific* attorney and this Court has "an independent interest in ensuring that criminal trials are conducted within [relevant] ethical standards." *Serra*, 4 F.3d at 1353 (6th Cir. 1993); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006). The Supreme Court has affirmed that trial courts "must be allowed substantial latitude to evaluate in the light of their informed judgment the facts and circumstances of each case, including any attempt by the Government to 'manufacture' a conflict to prevent a defendant from obtaining particularly able counsel." *Wheat v. United States*, 486 U.S. 153, 153 (1988); *see also Gonzalez-Lopez*, 548 U.S. at 152.

When evaluating claims for disqualification, the court should place a presumption in favor of Defendant's counsel of choice, but "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict," even if the Defendant wishes to waive the conflict. *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000);

---

[3] The Kentucky Bar Association declined to provide another opinion pursuant to KBA E-297 and KBA E-397. [*See* 33-1 at 1.] Consequently, the Court has the benefit of reviewing a more complete record than the Kentucky Bar Association had when they issued their initial opinion.

6

*see also United States v. Matsa*, 540 F.Appx. 520, 523 (6th Cir. 2013), *Wheat*, 486 U.S. at 153. When a motion for disqualification comes before the Court, the Court must be mindful of the ability of parties to use this as a "potent weapon;" and should carefully balance "competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988); *see also Serra*, 4 F.3d at 1352 (6th Cir. 1993).

The governing case in the Sixth Circuit on attorney disqualification is *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, 900 F.2d 882, 889 (6th Cir.1990). The corresponding state professional conduct rule is Rule 1.9 of the Kentucky Rules of Professional Conduct, which both parties agree is the correct rule to assess Mr. Wicker's representation. [*See* R. 30 at 5; R. 29 at 8.] The Sixth Circuit has acknowledged that the case law in this area is not clear as to whether courts are to apply the standard from *Dana* or simply use the professional conduct rule in the corresponding state as held in *National Union Fire Insurance Co. of Pittsburgh. v. Alticor*, *Inc.,* 472 F.3d 436 (6th Cir. 2007) (using Michigan's Rules of Professional Conduct). *See Bowers v. Ophthalmology Grp.*, 733 F.3d 647, 651 (6th Cir. 2013). However, the Sixth Circuit has held that "the effect of using the Kentucky Rules of Professional Conduct in place of or in conjunction with [the] *Dana* analysis is minimal at best because the relevant Kentucky Rule is essentially the same." *Id*. As preventing a Defendant from fully exercising his Sixth Amendment right is a serious consideration, the Court will look at all elements of the *Dana Corp* analysis here, as well as Rule 1.9, which each indicate that Mr. Wicker should be disqualified from representing Dr. Chalhoub.

**A**

*Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, held that an attorney may be disqualified if "(1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification." 900 F.2d at 889. According to the analysis below, this Court finds that Mr. Wicker (1) had a previous attorney-client relationship with SJHS, who is seeking disqualification through the Government, and has a current attorney-client relationship with Dr. Chalhoub here; (2) the subject matter of the two representations are substantially related; and (3) the Court is able to reconstruct scenarios where Kent Wicker might have obtained confidential information from SJHS. All three elements of the *Dana Corp* test are satisfied and disqualification is appropriate.

**1**

The first element of the *Dana Corp* analysis is determining if "a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify." *Id*. Kent Wicker does not dispute that he represented Catholic Health Initiatives and Saint Joseph Hospital in London, Kentucky, for several years, including during the investigation of a qui tam complaint that specifically mentioned Dr. Chalhoub. Though this case differs somewhat from *Dana Corp*, in that the United States is the party seeking to disqualify Mr. Wicker rather than CHI or SJHS, CHI and SJHS have agreed to cooperate with the Government to prosecute Dr. Chalhoub. CHI and SJHS are adamantly opposed to Mr. Wicker's representation of Dr. Chalhoub and claim that he has confidential information related to his prior representation of them. Even though Mr. Wicker's former clients are not parties to this case

directly, the Government indicates that they have cooperated and employees from Saint Joseph Hospital in London will likely be called as witnesses. Further, the alleged criminal conduct in question occurred while Dr. Chalhoub was employed by Mr. Wicker's former clients and Dr. Chalhoub was terminated due to investigations that arose from the qui tam complaint, all while Mr. Wicker was named as counsel for CHI/SJHS.

Mr. Wicker does not dispute his representation of CHI and SJHS, and they are cooperating with the Government, who seeks to disqualify Mr. Wicker. Consequently, the first element of the *Dana Corp* test for disqualifying Mr. Wicker's representation of Dr. Chalhoub is met.

**2**

The second element of the *Dana Corp* analysis requires that "the subject matter of those relationships was/is substantially related." *Id*. The comments to Rule 1.9 state that, "[m]atters are 'substantially related' ... if they involve the same transaction or legal dispute or if there is otherwise a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Ky. Sup. Ct. R. 3.130(1.9) cmt. 3. This Court finds that Mr. Wicker's prior relationship with CHI is substantially related to his current attorney-client relationship to Dr. Chalhoub.

Mr. Wicker alleges that the matters are not related, that the original investigation that he assisted CHI/SJHS with was related only to the overuse of stent procedures by Dr. Samesh Patil. [R. 30 at 2.] First, it is hard to imagine another set of facts that could be more substantially related. Both the case brought against Dr. Patil and the case brought against Dr. Chahoub involve medical doctors practicing in cardiology at the same hospital, with the same

9

administration (Mr. Wicker's former client), performing allegedly unnecessary procedures, who were both indicted as a result of the same investigation proceeding over a number of years. [R. 30 at 2; *see also* R. 29-3.] The charges brought against Dr. Patil led to the qui tam complaint, which led to the investigation that resulted in charges brought against Dr. Chalhoub. The actions alleged in the qui tam complaint against Dr. Chalhoub are the actual events that are charged in the indictment currently before the Court.

Second, Mr. Wicker does not acknowledge the qui tam complaint as a possible source of conflict. Even if Mr. Wicker's representation was not substantially related to the present case up to the point of receiving the unsealed qui tam complaint, and even if Mr. Wicker does not remember what type of confidential information he might have acquired through the span of the qui tam complaint, Dr. Chalhoub's unnecessary installation of pacemakers was certainly the subject of the qui tam complaint, even if he wasn't a named defendant. Emails that Mr. Wicker was copied on were named on a privilege log in response to Civil Investigation Demand arising from the qui tam complaint. [R. 29 at 17.] The actual case against Dr. Chalhoub before this Court is outlined in the qui tam complaint, which Mr. Wicker received as counsel for CHI/SJHS.

These matters are substantially related because they arise out of the same investigation, involve remarkably similar facts, and both involve Mr. Wicker's former clients, SJHS/CHI. The second element of the *Dana Corp* analysis is met here.

**3**

The third element of the *Dana Corp* analysis requires that, "the attorney acquired confidential information from the party seeking disqualification." 900 F.2d at 889. Comments to Rule 1.9 makes clear that the "former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has

confidential information to use in the subsequent matter." Ky. Sup. Ct. R. 3.130(1.9) cmt. 3; *see Bowers v. Ophthalmology Grp.*, 733 F.3d 647, 651–52 (6th Cir. 2013).Essentially, the Court must "reconstruct" the original attorney/client relationship and evaluate "what confidential information could have been imparted in that representation, and to decide whether that information has any relevance to the attorney's representation of the current client." *Bowers*, 733 F.3d at 652 (quoting *Koch v. Koch Indus.,* 798 F.Supp. 1525, 1536 (D.Kan.1992). The Court may also look at what the Defendant's "best defense" is and compare it with the attorney's previous representation. *See Serra*, 4 F.3d at 1352–53. The Sixth Circuit provides explicitly that the "most common example of an actual conflict of interest arising from successive representation occurs where an attorney's former client serves as a government witness against the attorney's current client at trial." *Moss v. United States*, 323 F.3d 445, 460 (6th Cir. 2003). In cases of "successive representation," a significant fear is that "the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." *Id*. The Sixth Circuit has acknowledged the difficulties of this model, but sees it as a "necessary alternative" to requiring parties to reveal confidential information about their client or their former client. *Bowers*, 733 F.3d at 652. This Court is able to reconstruct scenarios where Mr. Wicker would acquire confidential information from CHI/SJHS, meeting the third element of *Dana Corp*.

For example, the United States has indicated Mr. Wicker will be cross examining employees of his former client, CHI/CJHS during the trial for Dr. Chalhoub. Because this Court can't know the exact scope of Mr. Wicker's former representation and how that might affect his cross-examination of current or former CHI/SJHS employees, the Court must speculate as to the scope of Mr. Wicker's representation and reconstruct what confidential information Mr. Wicker

11

might have obtained while representing CHI/SJHS.  *See* Ky. Sup. Ct. R. 3.130(1.9) cmt. 3; *see also Bowers*, 733 F.3d at 651–52.  While discussing the overutilization of stent procedures performed by Dr. Patil, it is possible that CHI/SJHS might have told Mr. Wicker that they had placed unreasonable billing expectations on their cardiologists that pressured them into performing procedures that were unnecessary, which is possibly Dr. Chalhoub's best defense.

Mr. Wicker would naturally want to cross-examine any employee of CHI/SJHS who might know about this pressure to bill.  If he did cross examine on this issue, he would be betraying his confidences to CHI/SJHS.  If he did not cross examine on this issue, he would not be fully advocating for Dr. Chalhoub.  Alternatively, CHI/SJHS could have told Mr. Wicker that there was some sort of negligent supervision of the cardiologists or surgeons that led to the unnecessary procedures and he would have similar difficulties in cross examining CHI/SJHS witnesses.  Mr. Wicker asserts repeatedly that he doesn't remember much about his representation of CHI/SJHS, but even though this Court has no reason to disbelieve him, this is simply not a defense to an attorney subject to disqualification.  Speculating again, though this Court believes that Mr. Wicker does not remember any confidential information related to his representation of CHI/SJHS, imagine that he is cross examining an employee of SJHS and something that individual says sparks a memory of his former representation that is confidential, but perhaps beneficial to his current client, Dr. Chalhoub.  Again, Mr. Wicker will have to decide between betraying his former client's confidences and fully advocating for his current client, Dr. Chalhoub.  Though the Government can't identify any confidential information that Mr. Wicker possesses, that is the inherent difficulty of this test, and does not preclude disqualification.

There are several scenarios this Court can imagine where Mr. Wicker obtained confidential information related to overutilization of procedures generally at SJHS during the

course of his attorney-client relationship with them and he will most certainly be cross examining his former client during the course of the trial. For these reasons, disqualification is appropriate.

**B**

Finally, this Court turns to Rule 1.9, which holds in relevant part that "[a] lawyer who has formerly represented a client in a matter shall not thereafter . . . [r]epresent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." Ky. Sup. Ct. R. 3.130(1.9). This analysis tracks very closely with the *Dana Corp* analysis. The only additional element is whether the Defendant's "interests are materially adverse to the interests of the former client," as the former client here has not consented to Mr. Wicker's representation of Dr. Chalhoub. This Court finds that the current client's interests are materially adverse to the former client.

Dr. Chalhoub and CHI/SJHS, Mr. Wicker's current and former clients, are materially adverse because they are on opposite sides of the current prosecution. Mr. Wicker's former client, SJHS, is cooperating with the Government, who is prosecuting his current client, Dr. Chalhoub. It is possible that Mr. Wicker's current and former client will be placing blame on the other party for the criminal conduct alleged by the Government, putting them directly at odds and making the two parties materially adverse.

Because Mr. Wicker's former and current client are at odds in the instant criminal case, the final element left in the Rule 1.9 analysis is met. Mr. Wicker must be disqualified.

## III

According to the analysis from *Dana Corp*, combined with the additional requirement of material adversity from the Kentucky Rules for Professional Conduct Rule 1.9, Kent Wicker must be disqualified from representing Dr. Chalhoub in the current case. Additionally, "when counsel is disqualified, a court should not reach the other questions or motions presented to it through the disqualified counsel." *Bowers*, 733 F.3d at 654. Accordingly, it is hereby

**ORDERED**:

1. Kent Wicker is **DISQUALIFIED** from representing Dr. Chalhoub in this case;

2. The Clerk **SHALL TERMINATE** Mr. Wicker as counsel;

3. The Motion to Dismiss [R. 32] filed by Mr. Wicker is **DENIED**; and

4. An Order for Telephonic Conference will be entered promptly to discuss dates for trial.

This the 13th day of June, 2017.

Gregory F. Van Tatenhove
United States District Judge